Parker, J.
(Orally.)
In this case error is prosecuted to a judgment of the court of common pleas of Sandusky county. The case was reserved there for decision here. The case was tried to a jury upon the amended petition of Addie M. Smith, plaintiff below; the several separate anwers thereto of the plaintiffs in error — defendants below, and replies to these answers. The papers and pleadings are quite voluminous. The amended petition sets forth:
“That heretofore, to-wit: on the first day of January A. D. 1893, and from thence and until, and at. the time of the injury to the said plaintiff as hereinafter mentioned, the said defendants wrongfully, injuriously and negligently, did keep and harbor a certain dog, and that they and each of said defendants during all that time had notice of and well knew, that said dog was fierce, vicious and dangerous; and as they and each of them well knew that said dog was in the habit of attacking, biting,chasing and frightening teams, horses and horses attached to wagons, carriages and other vehicles, and also in the habit of attacking and biting mankind, of all of which said defendants and each of them had at all times full knowledge; and that said dog did afterwards, and while so kept and harbored by said-defendants as aforesaid, to-wit: on the eighteenth day of August, 1893, and'while plaintiff was riding in a buggy along and on the public highway, run out upon the public upon which plaintiff was then travelling as aforesaid, and fiercely and ferociously did spring at and viciously attack the horse drawing the buggy in which plaintiff was then riding; and by reason of said attack so made by said *302 dog upon said horse the said horse became and was frightened and unmanagable, and overturned the buggy in which plaintiff was riding,and threw plaintiff with great force and violence upon the ground, thereby inflicting upon plaintiff’s head and other parts of her body dangerous wounds and injuries, whereby she sustained a great loss of blood from her head and other parts of her body, a severe shock of the nervous system, and partial loss of memory. And by means of the injuries so as aforesaid inflicted upon plaintiff she has sustained permanent mental and physical injuries, total loss of hearing in one of her ears, and has at all times since she received said injuries endured constant pain and bodily suffering. ”
The petition sets forth in detail further results of the injury and certain specific damages in the way of doctor’s bills, etc., and contains an allegation that the full amount of damage sustained is twenty-five thousand dollars, and a prayer for judgment for that amount.
The answers filed by-all of the defendants, excepting the defendant Rutherford P. Hayes, seem to be nearly, if not quite, identical in form. I will read the answer of Fanny Hayes:
1st. Defense. For a first defense to the amended petition of the plaintiff filed herein, the defendant Fanny Hayes says, that her father, Rutherford B. Hayes, died, leaving a last will and testament, which is in the words and figures following, to-wit:
“ ‘In the name of the Benevolent Father of All: I,Rutherford B. Hayes, of Spiegel Grove, Fremont, Ohio, do make and publish this my last will.
“1. I wish all my just debts to be fully paid.
“2. I give and bequeath the home place known as Spiegel Grove, and all the personal property connected therewith, to Birchard A., Webb C., Rutherford P., Fanny and Scott Hayes to be by them held in common without sale or division of the same until all parties or the survivors of them agree to the sale or division, but in case of sale or division the same to belong equally to my said children or their heirs.
*303 “3. The residue of my estate, real and personal, I give and bequeath equally to my five children.
“4. The interest of my daughter Fanny in said estateds to be held by my son Birchard A. in trust for her benefit and support, and all payments by him are to be directed to her on her personal receipt or for her benefit.
“5, I appoint my sons Birchard A., Webb C. and Rutherford P. Hayes executors of this my last will and testament.
“6; The said executors are to have jull power to sell and convey said property, both real and personal, and to execute deeds and contracts relating thereto and to carry out existing contracts.
“It is my desire that my said executors be not required to file any inventory or to give any bond. I hereby revoke -all wills and codicils heretofore by me made.
“In testimony whereof, I have hereunto set my hand and seal this 12th day of April, 1890. Rutherford B. Hayes.’
“That said last will and testament was,on the 26th day of January, A. D. 1893, duly 'admitted to probate by the Probate Court of Sandusky county, Ohio, and recorded in the records of wills of said county, in volume B. at pages 163 and 164, •
“That among the assets of the estate of said Rutherford B. Hayes, deceased, was the dog in the. amended petition described, which the said executors, on and prior to August 18th, A. D. 1893, and thereafter until June 1, 1894, kept and harbored as and for the purpose of a watch dog for the protection, preservation and benefit of the estate of said deedents. ’’
The second defense, contains this paragraph:
“2nd Defense: For a second defense to said amended petition this answering defendant denies that the defendants in the amended petition mentioned, or either of them, did keep or harbor the dog therein described, and denies that they or eithsr of them knew that said dog was either fierce, vicious or dangerous. ”
And then follow other denials as to the alleged habits of the dog and as to the ■ defendants knowledge of such habits, and a denial of the circumstances alleged in the pe *304 •tition of the attack upon the plaintiff and the result of the injury.
The third defense is a somewhat vague allegation of contributory negligence. ' It is to the effect that the horse drawing the buggy in which the plaintiff was riding, as alleged in the amended petition, was so carlessly and improperly managed, that without any fault of this defendant and by want of due care in the management of said horse, the injury to plaintiff, if any, was sustained. “That said horse was skittish, easily frightened and not a road-worthy horse, all of which said plaintiff well knew.” But there is no direct allegation that the plaintiff was driving the horse or that the plaintiff was guilty of any contributory negligence in the premises.
For a Fourth Defense, it is said that the amended petition contained separate causes of action against the several defendants that are improperly jdined.
The answer of Rutherford P.- Hayes contains these second, third and fourth defenses, substantially as stated in the other answers, but it does not contain the first defense. I will inquire if I am right in assuming that that was the answer upon which he went to trial?
Mr. Bartleti: Yes: that was an answer filed after the demurrer to the first defense, and that was probably the reason why the first was left off.
The Court: Motion to reform the amended petition so as to have it state tbe facts showing wherein the liability of the five defendants was joint, and to strike it from the files because not conforming to the order of the court with respect to the original petition requiring an amendment setting forth such facts,etc,,filed,argued and overruled. There were special demhrrers filed, also on the same ground,that is to say — upon the ground that separate causes of action against the several defendants were improperly joined; and the same question was presented' by this fourth defense in the answer,
*305 The trial resulted in a verdict of $7,500 in favor of the plaintiff and against all of the defendants. There was also a special verdict returned upon the request of defenflants, under section 5201 Rev. Stat.
Motion for a new trial; overuled; judgment rendered, and a petition in error was filed m this court.
There are some twelve assignments of error; but the questions presented and argued here — omitting those which did not seem to counsel to be of enough importance to require argument, either oral or in their briefs, and which are not considered by the court of enough importance to require mention — the principal assignments of error are:
■ 1. Error in overruling special demurrer, on the ground that “Separate causes of action against several defendants are improperly joined.”
2. Error in admission and rejection of testimony.
3. Misconduct of attorneys for plaintiff, in argument to jul7'
4. Verdict not sustained by sufficient proof.
5. Special verdict not conformable to law, and insufficient.
6. That the damages are excessive.
7. Error in overruling motion for a new trial. The latter, however, does not present any qestion besides those above mentioned; except as to whether the verdict is sustained by the weight of the evidence.
As to' the first question, we are of the opinion that there is a cause of action stated against each and all of the defendants below, upon which they may be jointly sued. The general rule upon the subject is, that all who have united in the commission of a tort to person or property, whether the injury result from force, negligence, want of skill, or fraud or deceit, may be joined as defendants in a single action, or they may be sued separately, at the plaintiff’s -option; or he may sue two or more of them, and not all. *306 The only exception to this rule is in instances where from the nature of the case the tort cannot be committed by two or more jointly, as, for instance, in cases of oral slander. This general rule applies to the defendants below — the gist of their alleged wrong-doing being the keeping and harboring of a vicious dog.
Our conclusions that the rule is applicable to this case, and that sufficient facts are stated in the amended petition to show joint liability, are supported, we think, by the case of Jack, et al v. Hudnall, 25 Ohio St., 255. The report of that case is very short, and I will read it:
“This was an action by Hudnall against the plaintiffs in error, for trespass committed by their cattle upon Hudnall’s premises. The defendants (plaintiffs in error) denied the alleged trespasses. The cause was submitted to the court, a jury being waived, and the court found the facts specially, as follows:
“1. That the plaintiff sustained damages to the amount of twenty dollars, by reason of the trespass of some twelve heads of cattle, as in the petition set forth.
“2. That said three defendants lived on a farm which they owned and cultivated in common, whereon said cattle were kept.
“3. That the said cattle that committed the trespass were owned by the defendants,
“4. That there was no joint ownership in said cattle, but that each defendant owned a part of said cattle in his or her individual right, each owning certain ones of said cattle separate from either of the others of said defendants,”
There is an absence in the allegations of the petition here that these defendants were joint owners of this dog — the allegation being, in effect, that they jointly kept and harbored it; so that it makes the case as stated in the petition, and the case here as stated by the court substantially alike.
“Upon this finding the court rendered a judgment for the plaintiff, and the same was subsequently affirmed on proceedings in error in the district court, and it is now sought to reverse this judgment of affirmance, and also the judgment of the common pleas.”
*307 “Welch, J. As we understand the finding of the court, these cattle were in the joint possession and custody of the defendants. The finding at least fairly admits of that construction, and under the well-known rule, it should therefore be adopted, rather than a different construction, which would render the judgment erroneous. The cattle were “kept” upon the farm, and the three defendants own and “cultivated” the farm “in common. ” Prima facie, the defendants kept and cared for the cattle in common. This being the case, we have no hesitation in saying that the court below was right in holding that the defendants below were properly joined in the action.
All of the Judges concurred.
The first proposition in the syllabus is:
“Tenants in possession may be sued jointly in an action for trespass committed by animáis kept by them in common upon the premises, although the several animals are owned by them separately and individually.”
Making, in some aspects of it, a somewhat stronger case than this at bai.
The second alleged error that is brought prominently to our attention is, with respect to the admission of certain evidence and the exclusion of certain evidence.
It is urged that non-expert witnesses on behalf of defendants below were permitted, on crosss-examination, to testify to opinions as to the character of the dog. Our attention is called particularly to the testimony of William E. Lang, and to the testimony of A. J. Jackson, and their cross-examinations. In the course of her testimony in chief, the witness Lucy Keeler details her observations of the dog on various occasions. She seems to have been a friend of the Hayes family,and to have been frequently at their residence at Spiegel Grove, and to have been well acquainted with this dog, and after testifying as to the conduct of the dog so far as it came under her observation, she is asked this question, in chief:
*308 “<3' From your knowledge of him what do you say as to his being a quiet peacable, good-natured dog?”
On behalf of defendants they had not been content to allow the witness to merely detail to the jury the conduct of the dog, and allow the jury to draw its own conclusions as to the character of the dog, but the question was put to the witness direct as to the character of the dog — founded, of course, upon her knowledg*e and observation. Her answer is:
‘‘A. I am quite sure he was a quiet, peacable, goodnatured dog, from my knowledge.”
Not that the particular conduct which she observed was peacable, quiet and good-natured, but from her observation of said dog she concluded, and it was her opinion, that he was a dog of that character.
Now, upon her being cross-examined with respect to this opinion, this occurs (on page 566):
‘‘Q. And the conclusion you came to that the dog was a peacable dog was from and only from those«, acts that' you have described, while in the grove and about the home? A. Well, I might have formed other opinions from other circumstances,although I might not have remembered them.
“Q. You didn’t give any other circumstances? A. No..
”Q. Suppose that a man was driving along a public highway in a sleigh with his wife and babe in the wife’s arms, and the dog would leap at the horse, at the head of the horse, spring at him with .an attempt to grab the horse by the head or nose, miss the horse, pass' on by, then come back at the lady that was sitting in the sleigh and jump at her,and suppose she was pulled over away from the dog and the dog would run around and jump at the man and the dog was driven away with the whip, your opinions would be somewhat changed about the good nature of this dog, would it not?
(Objected to by defendant’s counsel; overruled by the court and exception taken,)
“A. If those are facts, my opinion would certainly be changed.
*309 “Q. Now, suppose that dog had run out upon the public highway from thirty to forty different times, and leaped at horses hitched to wagons and carriages, leaped at their noses, and barked and frightened them and ran after them and barked, now would that change your opinion of the good nature of this dog?
“(Objected to; overruled and exception taken.)
“A. I think that would change my opinion if it were proven to me.
“Q. Now, if this dog would attack a man and force him down upon the ground or sidewalk,and hold him there until he was kicked off, would that change your opinion as to the character of the dog?
(Objected to; overruled, exception taken.)
“A. If it were proven to. me, it would.
“Q. You mean to say if these facts existed I suppose your opinion would be different? A. No, if I were convinced.
“Q. If you were convinced these facts existed, that is what you mean? A. Yes.”
And then she proceeds to give her opinion that the dog was cowardly, and details s'ome circumstances indicating his cowardly nature.
The testimony of Lang and Jackson, the former appearing at page 621, and the latter appearing at page 692 to 695, need not be given here; it is sufficient to say that the question asked in chief in each instance was substantially the same as the question asked of this witness, Lucy Keeler, afe to the opinion of the witness of the character of the dog, and the cross-examination in each instance was substantially the same as the cross-examination of Miss Keeler.
There were certain remarks made by the court upon the examination of one of these witnesses, that perhaps I should call attention to. In the course of the cross-examination of Mr. Lang, which appears at page 623, we find the following:
* Q. Now, what do you say about a dog that would run and jump over the fence and attack horses and spring at their *310 heads and noses and cause them to run away and run after them barking, what would you say about that kind of a dog, would that be a vicious dog, in your opinion?”
(Objected to by defendant’s counsel; objection overruled, defendant excepted.)
“By the Court: The court has held that you were entitled to ask the witnesses as to the character of this dog, as to whether peacable, quiet character or not. This witness however answered this was not a viciou3 dog; that this was his answer directly,and it seems to me that the cross-examination should be as broad as the testimony of the witness in chief.I think that is proper cross-examination of such an answer as he was permitted to give in direct examination. The qufstiou may stand.”
Then comes the answer:
“A Well, I think likely I would,”
That is to say, he would form the opinion that it was a vicious dog if it indulged in such conduct as is described in the question.
Then the court makes this remark, in the presence of the jury:
“In connection with this testimony on cross-examination, it is not for the purpose of giving the jury his opinion of this dog on trial, but simply cross-examination on his standards of opinion. It is all the time a question for the jury, to determine whether or not this dog was vicious or not.”
„ And again, on the following page, after further questions of the same character:
“By the court: I will say that this is permitted by the court simply on the ground that they have the right to ask the witness on cross-examination, his standard of opinion.”
And in the course of the cross-examination of Jackson, at page 694, when a like question was presented to the court, the court makes this remark:
“By the Court, I think this cross-examination should relate to the knowledge of the witness; the holding of th§ court is, you may cross-examine him on his opinion and what his opinion would be if he had knowledge of such *311 things; I think you should adhere to that rule as laid down. The witness gives his opinion as to the dog, the court holds that you may ask if he knew this, that or the other thing; I do not think that question is in proper form. ”
Referring to the question just asked.
Again, on the following page:
“By'the court: That is admitted simply for the purpose of cross-examining this witness as to his opinion, not for the purpose of giving opinion of the dog in question and should not be so considered by the jury.”
In our opinion, this was competent cross-examination as a test of the basis of the opinion cf the witness that the dog was quiet and peacable and not vicious; to determine what he meant by the terms “quiet”, “vicious” etc.; but not to ascertain or show to the jury his opinion of the real character of the dog based . upon the facts assumed; and the court, we think, guarded the matter by proper cautionary remarks to the jury. That the assumed fact may not have been established by evidence, and though there may have been no evidence tending to establish the same, we think affords no ground for the objection to the testimony of this witness. The plaintiff had the right to test the witness by assuming and presenting for his consideration facts and circumstances entirely different from anything indicated by the testimony in the case, if he chose to do so. The real question to be ascertained by this course of examination was what the witnesses meant by the terms quiet, docile, goodnatured, or the contrary — vicious? Would they be of the opinion that a dog was vicious if it did this, or that, or the other? As a matter of fact, there was testimony in the case tending to establish the assumed facts.
The third matter presented for our consideration, is as to the alleged misconduct of plaintiff’s attorneys in argument.
*312 On page 952 of the bill of exceptions, this appears, as the utterance of counsel on behalf of defendant in error — plaintiff below — 'in the opening argument to the jury: •
“Never before in my short experience of nearly eighteen years, did I see that stubborn, unrelenting effort on the part of moral man to suppress truth and nothing but the truth as was upon the part of the defendants in this case.
“Col. Bartlett. (To the court.) If ycur Honor please, I take exceptions to this statement of counsel.
“No response by the court.”
It appears by the bill of exceptions that the court did not make any response when these objections were made and exception taken.
Also at pages 953 and 954:
“Col. Bartlett (one of defendant’s attoneys) sat here fcr the very purpose, hired by the sheckels of these defendants, for the very purpose that he did, to keep out the God’s honest truth.
“Col. Bartlett: (To the court.) I take exceptions, if your Honor please, to that last statement of counsel.
. “No response by the court.”
“Mr. Garver: They knew that if the truth was told in this case, that though the heavens would fall they could not escape a verdict at your hands.”
That particular utterance does not appear to -have been called to the attention of the court.
And again, on page 955:
“That dog was allowed to live only up to the time that they knew this case would have to be tried by a jury of twelve men. A few months before this case was called that dog was put to death; only a few weeks before this case was called for trial that dog was put to death by the hand or by the direction of one of these defendants who is interested to the tune of 125,000.
“Col. Bartlett: (To the court). I wish to lodge an exception to the last remarks concerning the dog being put to death.
“No response from the court.”
*313 On page 956, in speaking of the plaintiff’s witness, Rinebolt, he says
“He does not come here of his own volition, but’Lhe comes here under the strong arm of the law, and hej is brought here an unwilling witness.”
On page 957, speaking of the same witness, he says:
“His power of speech “Get out! Get out!” and the barh of the dog that could be heard a quarter of a mile brought to his rescue at that time and place one of thej[inmates of that house, one of the men that was around Lithat sanctum * * *
“Col. Bartlett: I object to that, if your Honor please. That testimony is not in the case; it has been ruled out.
“No response from the court.”
“Mr.- Garver: There it is again, when you call the jury’s attention to the God’s own fact, ‘I object! I want it to be so recorded.’ Oh, that hurts. . They are bleeding under that lash as they never bled before. My God! How can •we go to this jqry now and say that these parties did not have notice? Don’t you see? Fanny Hayes spent her summer upon that porch 80 feet long in front of the house and a side porch of almost the same dimensions and upon the croquet grounds and upon the lawn tennis grounds between the house and Buckland Avenue. Notice! Great Heavens, gentlemen!”
On page 958, he says:
“One of the most important things and one of the most important things in this case is: Did these defendants have notice? Fanny Hayes, out upon the grounds within 260 feet of the public highway, with this dog barking with that voice of his, as he has been described to you, what do you say? Called back — “Come back!”
“The cries of that old man brought to his assistance one of the inmates of that house, the man that was upon the ground, and when that dog heard that old familiar sound of the old man Elliget he knew enough to obey and to return. ’ ’
“Col. Bartlett: I object to the counsel assuming that there is any evidence that Fanny Hayes was upon the *314 grounds at the time of the alleged attack by this dog upon Mr. Rinebolt, and except to the remarks assuming that there is such evidence.
“No response by the court.’’
“Mr. Garver: Again we have got it. From the time the testimony in this case was offered until the time when the feeble arguments are to close we are to be stopped. Stopped for why? I will tell you why. He thinks he will lure us from the point and the thread of our theme. I say that that was the purpose and the intention of counsel. When witnesses were testifying he was talking, and he objected and objected and objected, hoping that you would miss a part of this, and you would not be able to hear it all, and so it. was from the mouth of that distinguished lawyer when anything hurt or cut deep, 'I object.’’’
The charge in this argument of efforts of defendants’ and their counsel to supress the truth, was evidently founded upon and was stated as an inference from what had occurred upon the trial, circumstances which were open to the observation of the jurors,and from which they might have drawn entirely different and contrary conclusions. It does not seem to have been stated as a fact upon- which counsel were proceeding to give the jury information. It was a very general statement, and while it may be open to the criticism that it was a remarkably extravagant charge, that' very quality would be likely to go a great way towards rendering its effect nugatory and harmless. While we cannot commend this method of address, and do not consider it a good substitute for argument, yet allowance must be made for the zeal of counsel and the heat of debate,and we would not feel justified in setting aside a verdict upon the assumption that the jury had not made proper allowance on these accounts.
The general charge that the defendants and their counsel were keeping from the jury certain facts that the plaintiff was trying to bring before the jury, is abundantly justified by the record; but, instead of being a subject for unfavor *315 able criticism, it was really cause for commendation of defendants’ counsel, since these facts, though facts and truths, were not pertinent, and were properly excluded. In so far as the efforts of counsel for defendants in this direction had been successful, they had the approval of the court in its rulings, and the jury doubtless had enough intelligence to give that fact due weight. We think it unlikely that this statement which implied undue effort to keep back facts that might be prejudicial to the defendants, would have been prejudicial to the defendants even before their counsel had addressed the jury upon this subject; and after his dispassionate, fair and judicial statement of his attitude, we feel sure that any doubt of the propriety of his conduct must have been dissipated. It will be observed that it is not charged that any fact that should have been known by the jury, had been concealed from them' — -that is to say, that the efforts of counsel to exclude anything from the jury that they should have known, had been successful, or that this proof had been prevented; but the substance of the statement is that the facts in evidence were not such as to warrant and ensure a verdict, and that the effort made to exclude certain evidence amounted to a confession of its damaging character, a very common line of argument, although not usually pursued with so much vehemence and with such strong asseverations as were employed in this instance.
As to the statement at page 955, to the effect that the dog had been put to death by direction of one of the defendants; and at pages 956 and 957, to the effect that Fanny Hayes was upon the grounds and in hearing at the particular time when this dog had been chasing a . team and was called back by some one on the grounds, this appears to have been stated as counsel’s inference — as deduced from *316 the evidence, and not‘as a fact outside of the evidence — a deduction which he wishes to have the jury adopt. Whether this would be fair inference from the facts proved, we need not consider, since we cannot in any event hold that it is prejudicial error to draw even absurd deductions from the facts and press them upon the consideration of the jury. The prejudice in such case is more likely to result to the side employing such arguments. That there was such an incident as the chasing of the teams and the calling back of the dog, appears to have been shown, and while the witness was not permittd to testify to certain declarations of, the person who called the dog back, the fact of the chasing .of the team and calling back of the dog does not appear to have been ruled from the jury.
We cannot say that any prejudicial error resulted from the silence of the court when the suggestion was made by the objection and exception of counsel, that the limits of fair and legitimate argument were being transgressed. We so hold upon the assumption, but without deciding that the action of the court was duly invoked, that the silence of the court amounted to an adverse ruling, and that exceptions were duly saved. The general trend of the authorities upon this subject is indicated in the following sections, from Thompson on Trials, Chapter XXX, Vol, 1, where the whole subject, in all its various aspects, seems to have been very fully discussed and a great many authorities cited. In sec. 965, this appears:
“Observations on Limits Allowed to arguments. On this subject it was said by Fowler, J., in what has come to be regarded as a leading case: ‘The counsel represents and is a substitute for his client; whatever, therefore, the client may do in the management of his cause, may be done by his counsel. The largest and most liberal freedom of speech is allowed, and the law protects him in it. The right of discussing the merits of the cause, both as to the law and the facts, is unabridged. The range of discussion is wide. He *317 may be hoard in argument upon every question of law. In his address to the jury, it is his privilege to descant upon the facts proved or admitted in the pleadings; to arraign the conduct of the parties; to impugn, excuse, justify or condemn motives, so far as they are developed in evidence, assail the credibility of witnesses when it is impeached by direct evidence, or by the inconsistency or incoherence of their testimony, their manner of testifying, their appearance upon the stand, or by circumstances. His illustrations may be as various as the resources of his genius; his argumentation as full and profound as learning can make it; arid he may, if he will, give play to his wit, or wings to his imagination. ”
In sec. 983, we have this:
‘"Nor is it ground for a new trial in a criminal case, that the prosecuting counsel has made an illogical argument, or has mis-scated the law in his address to - the. jury; the adverse party can secure a correction,”
And there is much more upon the same subject, especially in sec. 989.
Fourth. The verdict is challenged upon the ground that there is insufficient evidence to sustain it.
Upon this head it was urged on behalf of the plaintiffs in error, Fanny Hayes and Scott R. Hayes, that there was an entire failure of proof to show that they participated in the keeping, or the harboring of this dog, at or about the time that plaintiff was injured,as alleged,to-wit, August 18,1893.
Certain facts touching the ownership and custody of the dog are stated in all the answers, except that of Rutherford P. Hayes; that is, that it was owned by Rutherford B. Hayes, the father of the defendants, in his lifetime; that it constituted a part of his personal estate at his decease; that after his decease — which occurred in January, 1893— and on until the 18th day of August, 1893, and thereafter until June 1st, 1894, it was “kept and harbored as, and for the purpose of a watch-dog, for the protection, preservation and benefit of the said estate.” The answer further *318 setsjjforth, that the persons who then kept and harbored this dog, were the defendants, Birchard A. Hayes, Webb 0. Hayes and Rutherford P. Hayes, who were the executors of theUast will and testament of Rutherford B. Hayes, and thatthey so kept and harbored it as executors. Then comes ajdenialthat any of the defendants kept and harbored the dog. The separate answers of the defendants Birchard A. Hayes and Webb O'. Hayes, were formally introduced in evidence by the plaintiff below. This was objected to, and exception taken; but we find no error in this, though we do not see the necessity or utility of this action, The declarations against interest, and the admissions of parties in^their pleadings, are matters before the' jury that they have a right and are bound to consider without the formality of their introduction in evidence. I should modify that statement somewhat in view of the fact that, upon demurrer, this part of the answer was stricken out; that may possibly have made it necessary to introduce so much .of the answer as had been held bad on demurrer, in evidence. Now, the allegation that Birchard A. Hayes, Webb 0. Hayes and Rutherford P. Hayes, harbored this dog “as executors,” that is, in a representative capacity, cannot be regarded as of Isgal significance or effect. The admission that they kept and harbored the dog, stands with all it implies and all the legal responsibility it involves, and the statement that they did this as executors, is nugatory, and may be disregarded. The denial that these persons did keep and harbor, amounts to saying that they did not so keep and harbor the dog personally; that is, that they did not do it personally because they were acting in the capacity of executors. When taken and reconciled with the other statement as to their keeping and harboring the dog as executors, it does not amount to a complete denial of the keeping and harboring by these persons who are the executors, Though they may have been acting *319 as executors, yet they are personally responsible, and cannot require the plaintiff to seek relief against the estate. It is doubtful if they could have recourse against the estate for indemnity; but this we need not consider.
The case then on this point, stands admitted by two of the three executors, defendants, viz: Birchard and Webb.
The case as to Fanny and Scott, stands differently, in this: that while they admit that the dog was a part of the assets of the estate of their father — that it was kept and harbored as a watch-dog for the protection, preservation and benefit of the estate, at the time when the mischief was done, they say that it was not so kept or harbored by them, or either of them, but that it was so kept and harbored by Birchard A., Webb C. and Rutherford P. Hayes. So as to them, we must look to the proof to see whether they participated in the.keeping and harboring of the dog at the time in question. While we are of opinion that a finding upon the pleadings that the dog was kept and harbored by at least two of the executors that I have mentioned, would have been justified, yet our conclusions upon that point do not rest entirely on this deduction from the pleadings.
About the place where the dog was kept and harbored there is no question. It was kept and harbored at Spiegel Grove, the homestead of Rutherford B. Hayes in his lifetime, and a home for some at least of the defendants, and a place of common resort for all after his death and after the 18th of August, 1893.
Now, this homestead “and all the personal property connected therewith,” is devised and bequeathed, in clause 2, of the will, to all these defendants in common, to be “held in common without sale or division of the same until all parties, or the survivors of them, agree to. the sale or division, etc.” We are of the opinion that the dog, which had been kept on these premises since a pup, was a part of the *320 “personal property connected therewith,” the same as the cats or imprisoned birds, or the coach horses, or cows, devoted to domestic uses and on the place at the time of the decedent’s death. This “personal property”is not confined to household goods or furniture, or to the inanimate property.
Though by clause á of the will, the interest of Fanny in the estate was to be held for her in trust by Birchard A., and by clause 6 the executors were given full power to convey the property, “both real and personal,” yet we are of the opinion that these powers as to the property set forth in clause 2, if they applied thereto at all, were curtailed and qualified by the provision that all the heirs were to hold their property in common, and that it was not to be sold or divided without the consent of all. That therefore every one might, on his own motion and account, exercise his individual right, in common with the others, to hold the property; and that this, as to the dog, involved the right and power to keep and harbor it upon those premises. Did Fanny and Scott exercise this right, or was it surrendered to the others, personally, or as executors? We cannot go over the evidence on this point in detail. Proceeding from this conclusion as to the meaning and effect of the will,.we believe that there can be no reasonable conclusion upon the fact, other than that Fanny and Scott participated in keeping and harboring the dog. Miss Fanny was residing at Spiegel Grove, and was the conductor of the household affairs, a large part of the time intervening between the time of the decease of her father and’ the time of the accident, and in that capacity she ordered and bought food for the dog, and had him fed. As to Scott, the dog was purchased for him, and seemed to be regarded by him and by the others as in a.special sense,his dog. He brought it home when a pup and looked after its feeding and care. Though be was living in Cleveland during the period from the *321 death of his father until after the 18th of August, 1893, yet he was often back at his old home, apparently not as a mere guest, but as one having rights and privileges there, and on certain oFthese occasions he gave directions about the feeding and care of the dog. As before stated, his right to keep and harbor that dog there was as full and complete as that of any of his brothers or his sister, and as full and complete as his right to-have any of the personal property covered by clause 2 of the will kept there. This right was not dependent upon his making that his home. It also appears that the household expenses — including the cost of food for the dog — were paid from a common fund in which all the defendants had an equal share and interest. It does not appear that any one of the defendants ever objected to the dog being kept and harbored there,until sometime after this accident, when he was taken to Cleveland and disposed of — perhaps killed — by Webb’s order. It is true that neither one of these defendants — Scott nor Fanny, could have, by their own motion and without consulting, the others, disposed of this dog; it was not possible to control their undivided interests in the dog otherwise than as the whole dog was controlled, and it might be said that each was somewhat at the mercy of the others in case there should be a difference. As I have said, however, none of them seems to have objected to the dog being kept and harbored on the place as it was. What the effect would' have been if Miss' Fanny, for instance, had treated the dog after the manner that Rip Van Winkle’s wife G-retchen treated his dog Schneider, we cannot say, though perhaps it need not be doubted but such positive action could be taken in the premises by either, as to relieve him or her from all responsibility on account of the conduct of the dog.
I have mentioned in a general way part of the facts only that lead us to the conclusion which seems to us to be inev *322 itable — 'that Fanny ancl Scott participated with the others in keeping and harboring this dog.
As to Rutherford P. Hayes, T have ppinted out that his answer differs somewhat from the others, and that it does not contain this averment with respect to the ownership of the dog, its disposition by the will, and its subsequent custody, keeping and harboring by-the executors. But, independently of that, we find with respect to him, after full discussion of the testimony, that he was living at home during the spring and summer preceding this accident, and was the overseer of the premises,at least upon the outsidejof the house, and took an active part in the purchase of and paying for the provisions, including food purchased for the dog; knew of his being there, and certainly had a right to and did exercise some authority with respect to the animals kept in and about the premises.
Under the head of “Failure of Proof” it is also urged that the scienter has not been established as to any of the defendants; and if as to any, not as to all. Counsel differ widely as to the law upon this point, and many respectable authorities are found to sustain the opposite claims of the parties. Upon the one hand it is claimed that the owners of domestic animals are chargeable with notice of their vicious propensities without having any actual notice. Upon the other hand it is contended that actual notice must' be brought home. And there appears to be a middle ground upon this subject. As indicating one view, I read a clause from Clark v. Hite; Tappan, page 1; not because it is authority of the highest character, but simply because the proposition is very tersely and clearly stated. The judges sitting in the cases were Tappan, President, and Comber, Speers and Kirkpatrick, Associates:
“Case: — The declaration was in the usual form, and claimed damages for the loss .of a hog killed by the defendant’s dogs. Plea, not guilty.
*323 “It appeared from the evidence, that the plaintiff’s hog was killed by two dogs belonging to defendant, in the woods near the field. The dogs had before been seen chasing plaintiff’s hogs, and the plaintiff had given the defendant some notice of it. It was doubtful, however, from the evidence,whether the defendant actually knew that his dogs were accustomed to chase and worry hogs.
“The President observed to the jury: That there seemed but little room to doubt, from the evidence, that the defendant’s dogs had killed the plaintiff’s hog; that the principal point in dispute was, whether the defendant knew that his dogs were accustomed to do such mischief; it was necessary that such knowledge should be averred and proven, to support this form of action — -but how proven? The. pre-, sumption of law is, that every man is acquainted with the habits and disposition of his domestic animals, so that, to make out the fact of knowledge, nothing more is necessary than to prove that the dogs were the property of the defendant and domesticated by him. Verdict for the plaintiff.’’
We do not find is necessary, however, in this case, to rely, upon the proposition stated by the court in that case. The trial judge charged the jury as follows:
“If you should be satisfied by a preponderance of the evidence, as I have said, that the dog prior to the 18th day of August, 1893, had a disposition and propensity to attack horses and teams, and had shown such disposition and propensity by his character and acts, then you will inquire whether or not the defendants, or any one of them, had notice or knowledge of such habits, disposition or propensity on the part of said dog, for the defendants cannot be held liable in this action, nor any one of them, unless you are satisfied by a preponderance of the evidence that such defendant or defendants, had notice or knowledge of the propensity or habit in the dog, complained of in this action..
“It is not necessary that any formal notice should be given, but the notice or knowledge must be of such a kind or character as would put a person of ordinary care and prudence upon his guard; that is, notice or. knowledge of such facts as would lead a person of ordinary care or pru *324 dence, to believe that the dog was liable to commit such acts in the way of attacking teams and horses as are complained of here, and thereby injure persons and property. If you should fail to find by a preponderance of the evidence, that the defendants, nor any one of them, had such notice or knowledge, as I have defined to you, then your verdict must be in favor of all of the defendants, for there can be no verdict against the defendants,or any one of them, in this action, unless you are satisfied by a preponderance of the evidence that such defendants had such notice or knowledge of the character or propensity of the dog, as is complained of by the plaintiff in this action. And in determining this question,you will consid'er all of the evidence relating to, or bearing upon that subject,” etc.
No exceptions were taken to the charge, and there areno exceptions on account of the court having failed to charge any other propositions desired.
In so far as this charge limits the effect of notice to one of the joint owners, or one of those who may be jointly keeping and harboring the dog — limits the effect to those that had received such notice, we think it is' too favorable to the plaintiffs in error; we are of opinion that notice to one of the joint owners, of the vicious propensities of an animal which is being kept and harbored jointly by them, is notice to all, and, coming to consider the verdict upon the evidence, we do so- with this rule in mind and giving it effect.
There is also much respectable authority to the effect that notice to the servant having the care of the animal, is sufficient. Now, there is some evidence tending to show that direct and positive information of the viciousNcharacter of this dog was given to one of the defendants, viz: Rutherford P. Hayes, by a person who had been attacked by- the dog — Mr. Mills. He first testified to the dog having'made an attack on him and his having cudgelled^the dog and caused it to beat a retreat; and afterwards, upon being called, he testified — pages 601-2 — as follows: He was *325 asked whether he had any conversation with Rudd — that is Rutherford P., upon the subject of his conflict,or contact with the dog, and he ans,wered as follows:
“Now, in regard to the name of this dog, I wouldn’t testify as to that; I don’t know the name, I was down town a short time, within that same week, I wouldn't say what day I was down town, and met the one they called Rudd, met him near the Savings Bank, and he stepped up to me and says, ‘Do you know anything about who hurt my dog?’ Isaid, ‘Did some one hurt your dog?’ And he said, ‘If I knew the man, or could see the man, I would be tempted to boot him.’ I said ‘Perhaps I am the man. I said ‘You had better take care of that dog, or you might get into trouble ’ He said ‘Some people get too smart sometimes,’ ’and went into the bank; that is all that was said.’’’
“Q. What was said on the subject if the dog would attack you again? A. .1 said ‘He will get worse if he attacks me again. ’’
He was cross-examined upon that subject, and adhered to the statement. Mr. Rudd Hayes denies, as a witness, that such a conversation occurred. The question was for the jurj.
There is also some testimony tending to show that Rutherford P.had been advised that a horse had been frightened. This testimony, however, does not tend to show that this occurred through any fault of the dog; the dog may have been behaving himself and may have been entirely innocent of wrong when the horse was frightened. Independently of this, there is much evidence of the vicious conduct of the dog in the roads bounding those premises and at no great distance from the house, covering the period from the death of Rutherford B. Hayes until the date of the plaintiff’s injury, besides events occurring before the death of R. B. Hayes. These may be considered both as bearing upon the question of the character of the dog and the question of notice, actual or implied, to the defendants of that character. For convenience I will read from the notes of *326 the trial judge on overruling the motion for a new trial, for an epitomized statement of the conduct of the dog:
“Witnesses testified to the dog running out in the road, jumping over the fence, jumping at horses’ heads in the road in the vicinity of this residence, all the acts of the dog put in evidence were in the vicinity of Spiegel Grove, The evidence showed that the dog weighed probably 125 or 150 pounds, that he was 32 inches in height, or thereabouts. That he was an English mastiff,of rather strong and powerful build, that he had a very loud bark — which one witness testified could be beard a quarter of a mile — other witnesses testified that he roared, and some that he growled,and these witnesses testified, as I say, about the dog running out as they passed by, jumping over the fence, jumping at their horses’ heads. One witness testified to the dog jumping at his horse, then coming around and snapping at his wife who was in the sleigh with him, and then going on the other side and snapping at him. One witness testified to driving a mare, and of the dog coming out and trying to get hold of the mare’s leg. One witness testified to fhe dog coming out when the horse got his leg over the tongue. Another testified to the dog coming in the road and the horse rearing and the dog getting under his feet and barking and snapping, and the horse jumping, and the witness testified that he turned in his buggy and fired several times, hollering at the dog. Before that, many testified to hollering at this dog and at their horses when the dog came out. One testified to seeing the dog come out when two women were in a buggy, hearing the screams of the women, seeing the dog chasing the buggy for some distance. Others testified to seeing the dog chase horses and buggies in which men were driving over the hill, as far as they could see them. One witness, by the name of Muchmore, testified that he was going by on the road at one time, and the dog came out and got on to him and pushed him on the ground and tried to bite him, and held him there until some woman came out of the Hayes residence and got the dog off. A man by the name of Mills, testified to the dog attacking him on one occasion in June, 1893, and says soon after that he came along and saw the dog again, and struck him with a club, and the next day he saw one of the defendants, Rutherford P. Hayes.”
*327 Witness then proceeds to narrate the conversation between himself and said defendant.
“A witness by the name'of Kridler, testified that he was in the grounds with a man and a child, driving, and that Gen. Hayes was sitting on the porch, and the dog ran after his horse and wagon and chased him out of the grounds, and followed him down the street for some distance and frightened his horse, and Mr. R. P. Hayes testified that Kridler told him that after ‘that, that dog, or some dog there, had frightened his horse, without stating any facts with regard to it.
“Now, there were a large number of these witnesses, more than I will stop now to refer to.” .
And I may say that the trial judge does not undertake to, and does not give all of the instances testified to by the witnesses as to the attacks made by this dog upon persons and upon horses: they are quite numerous, and I will not venture to say how many,but they were quite frequent, and they were upon the roadway at the front or the side of the house, or at the two fronts of the house, within a few hundred feet — certainly within a distance where a dog that “barked and roared,” as the jwitnesses testified this dog did on such occasions, could baye^been readily heard in and about the house.
Applying certain rules deduced from the authorities, which vfe deem reasonable and correctjrules of law applicable to this case on this point, viz:
First — That the question of scienter is^for the jury.
■ Second — That notice to one joint owner, keeper or harborer, is notice to all.
Third — That this notice need not be actual, but may be inferred from circumstances; and,
Fourth — That the keeper and harborer of an animal of a kind that frequently develops and|displays vicious propensities, is chargeable with notice of such vicious habits of such animal as must have come to his knowledge if he had *328 exercised such reasonable care and watchfulness as a prudent naan ought to exercise over an animal of.that kind; and holding that a dog is an animal of that kind, we conclude that the evidence justified the finding of the jury that the defendants below had, or were chargeable with notice of the vicious habits of this dog. And we reach this conclusion without invoking the rule that one who harbors a dog as a “watch-dog'’ is chargeable with knowledge that its character is so ferocious as to make it unsafe to allow it to remain unconfined — a principle firmly established by the authorities and that might well be applied here, in view of the admission of all the defendants that this dog was kept and harbored as a watch-dog. The proof, however, seemed to indicate that this dog was not ferocious in the sense that he would bite, tear, or rend those attacked, but he was, nevertheless, a roaring and howling nuisance, and his viciousness in this respect .made him dangerous to passers bj on the public highway.
It is contended that the proof does not justify the conclusion that the dog attacked the horse on the occasion of plaintiff’s injury. It is true that plaintiff does not say it did so. Perhaps she did not see or hear the dog — her testimony is open to that construction, and others near by did not see or hear it on that occasion; but that may be true,and yet the dog may have attacked the horse just as the husband of the plaintiff testifies. He was personally present in the buggy, with his wife, driving the horse,and he testifies circumstantially to the attack having been made upon the horse by the dog. No one contradicts him directly, and his testimony contains no intrinsic evidence of falsity, so we cannot say that the jury was bound to disbelieve him.
In this connection I will dispose of the seventh ground by stating briefly that we do not find that the verdict is against the weight of the evidence.
Fifth — The fifth ground of error is: That the special verdict is insufficient in form or substance.
*329 Without stopping to read it, I will state that the special verdict follows very closely the amended petition, taking it up paragraph by paragraph, and the jury reciting that they find the facts as stated.
There can be no valid objection, as it seems to us, to following the language of the pleadings — since the facts are to be pleaded, and the facts are also to be found. The factb appear to have been well pleaded, and so formed a good basis for a special finding of facts.
But it is alleged that it is faulty in that it does not contain any finding upon the'issue as to the alleged contributory negligence.
There is no evidence in the record in support of the allegationjff contributory negligence; so there was no affirmative^fact to be found on this head.
The absence of an affirmative finding as to any issue, amounts to a finding against the party upon whom rested ths^burden. of proof as to such issue, and hence the implied finding on that issue of contributory negligence is against the plaintiffs in error.
All the facts necessary to be found affirmatively to justify the general verdict,"and as to which the burden of proof rested upon the plaintiff below, were found in her favor.
In support of the proposition of law just stated — that silence as to a given issue amounts to a finding against the party upon whom rested the burden of proof as to such issue, I call attention to 66 Indiana, 386, Graham v. The State ex rel. Board of Comr’s. of Jefferson Co. One of the propositions of the syllabus of this case is-as follows:
“Under the statute of this state, only the facts which are proved upon the trial of a cause are to be found in the special verdict, or stated in the special finding; and if the facts proved and found leave some issues in the case undetermined, those issues must be regarded as not proved by the party having the burden of proof; and in such Gase the *330 special finding is not objectionable because it does not pass upon all of the isssues, and affords no sufficient cause for a venire de novo. ’'
This proposition is discussed on- pages 394 to 396, of this volume. I will not take the time to read this- — -since I have consumed a great deal of time already. There are other Indiana cases in the same line: 102 Ind., 90, 101, 291; 76 Ind., 264; 106 Ind., 464. Now, that was held under an Indiana statute, of which our statute — as we are advised — -is an exact copy, the Indiana statute having been first adopted.
Sixth — The sixth and only remaining ground . urged is, that the verdict is excessive, so much so as to indicate passion or prejudice, and to warrant the conclusion that as to the whole amount it is not supported by the evidence.
It appears from the testimony that the plaintiff was thrown out of a buggy, upon her head and shoulders perhaps, at all events there was a severe contusion on the head and jaw; she was wearing artificial teeth, one part of which is attached to the bill of exceptions, which were broken in her mouth,and which cut the roof of her mouth badly,causing it to bleed profusely. She was stunned by the fall, and persons who went to her immediately afterwards found her bleeding, not only at the mouth, but at the nose and ears. The testimony tends to show 'that thereafter,for some days, and especially during the night season, she suffered intense pain; that lumps gathered upon the back of her head and neck soon after this injury. For some time after,-instead of a discharge of blood from the ear, there was a discharge of pus.
Afterwards the pain became so intense in the region of her ear and back of her head,that surgeons were called. She was put under the influence of anaesthetics, and a surgical operation was performed,by first cutting and then chisseling into the bone at the back of the ear — -into the mastoid process *331 —chisseling from three-fourths of an inch to an inch into this part of the skull, which • they found diseased and filled with a cheesy substance, which afterwards seemed to liquify and run off as blood and pus. This opening did not heal for a long time,and she suffered a great deal of pain and inconvenience. The plaintiff, before this accident, seems to have been a very hearty woman physically, and a very bright and active woman mentally, one who took pleasure .in society and in reading and thinking about topics of interest. Since this accident her nature seems to have been entirely changed. She is extremely frail and delicate and nervous, and her memory is impaired,almost gone; she can not remember what she reads, or hold to a topic consecutively in discussion. As another Tesult of her accident, she often has fainting spells; becomes dizzy and falls, and seems to become partially unconscious of her surroundings. There is no doubt but she was very seriously injured, and not much doubt but her injury is permanent, and that her hold upon life is precarious.
The amount of recovery was seven thousand five hundred dollars. It is true, as suggested, that she was not a wage-earner,but she was the house-keeper of her husband. There is nothing in the case to justify any vindictive or punitive damages. The court charged the jury fairly upon that proposition — the damages must be compensatory only. The plaintiff, if entitled to recover at all (and we have decided that she was entitled to recover),is entitled to a substantial amount. It is urged that, since her condition is so deplorable, the court should not disturb a verdict of any amount, because no amount could fully compensate her for what she has lost. That is true. It is true, no doubt, that she would not accept if the amount were offered to her when she was in her senses, 7,500.00, or many times that, to be *332 deduced from her former health to her present condition. But, if we were to apply the rule that because such a condition and such injuries cannot be fully compensated, that no verdict would be too high because it cannot compensate, we could not interfere with the most enormous verdict in a case of this kind, We do not think this is the true rule to be applied. A verdict of $7,500, against a man in the ordinary walks of life, would be ruinous; it would sweep away the accumulations of a life-time of the ■'ordinary professional man or merchant or farmer, or of ;any one belonging to the middle classes of society. We have ■concluded that this verdict should not stand for the full amount. We do not find that the verdict being so high is the result of passion or prejudice, or that on account of the operation of passion or prejudice the judgment need be reversed, but we are inclined to think that all in excess of five thousand dollars of the verdict is hardly supported by the evidence, and we have concluded that if a remittitur is entered as to all in excess of $5,000, we will affirm the-judgment for that amount. If such-remittitur is not entered, the judgment will be reversed on the ground that the verdict for the full amount, i. e. for the amount in excess of $5,000, is not sustained by the evidence.
Bartlett & Wilson, and Birchard A. 'Hayes, for Plaintiffs in Error.
D. B. Love, Finefrock & Garver, and Basil Meek, for Defendant in Error.